**Donald R. ANDERSON, et al., Plaintiffs,**

v.

**Ramon MORTELL, et al., Defendants.**

No. 88 C 9285.

United States District Court, N.D. Illinois, E.D.

Sept. 21, 1989.

Robert A. Motel, Robert A. Motel, P.C., Skokie, Ill., Alan Rhine, Chicago, Ill., for plaintiffs.

John W. Dondanville, Michael A. Pollard, Baker & McKenzie, Chicago, Ill., for defendants James and Ramon Mortell.

William E. Rattner, John F. Zabriskie, Hopkins & Sutter, Chicago, Ill., for First Trust Bank, N.A.

## ORDER

BUA, District Judge.

Plaintiffs in this consolidated action seek recovery under certain provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs' four-count consolidated complaint alleges that defendants committed certain improprieties in connection with the management of an employee profit sharing plan in which plaintiffs participated. The parties agreed to a bench trial, which was held from July 24 to July 26 of 1989. Having heard all of the evidence presented at trial, and having considered the arguments made by the parties, the court hereby makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. Plaintiffs are present and former employees of the Mortell Company, a corporation in the business of manufacturing various adhesives, coatings, and sealants. During the course of their employment with the Mortell Company, plaintiffs participated in and obtained vested rights in the Mortell Employee Profit Sharing Plan ("the

Plan"). (Uncontested Facts,[1] paras. 1–3; Plaintiffs' Exhibit 2.)

2. The Plan is an "employee benefit plan" within the meaning of ERISA, and at all times material to this suit the Plan was subject to the provisions of ERISA. The Plan is a single-employer defined contribution plan covering all of Mortell Company's full-time employees age twenty-five or older with at least one year (1,000 hours) of service. Contributions to the Plan may be made by the Mortell Company based on the sole judgment and discretion of its board of directors. Employee-participants also may voluntarily contribute to the credit of their individual accounts; an employee's contribution cannot be less than 1 percent or more than 10 percent of his or her annual compensation. (Uncontested Facts, para. 8.)

3. Defendant James W. Mortell was a shareholder of the Mortell Company from 1976 to 1986. In addition, he was a trustee of the Plan from 1976 until April 15, 1983, and a participant in the Plan until 1986. (Uncontested Facts, para. 4.)

4. Defendant Ramon Mortell, James' brother, was likewise a shareholder of Mortell Company from 1976 to 1986. He also served as a trustee of the Plan from at least 1980 until April 15, 1983, and he was a participant in the Plan until 1986. (Uncontested Facts, para. 5.)

5. Defendant George Blais was a vice president of the Mortell Company. Until his death in September 1982, he served as administrator of the Plan. (Uncontested Facts, para. 6.) On March 7, 1987, the court entered a technical default judgment against Blais' estate for failure to answer or appear.

6. In the fall of 1982, James and Ramon Mortell received advice from their attorney, John Marshall of Mayer, Brown & Platt, that the Mortell Company should become a Subchapter S [2] corporation in order to avoid double taxation. (Uncontested Facts, para. 10; Tr. 101.)

7. Marshall informed the Mortells that in order for the Mortell Company to qualify as a Subchapter S corporation, the company's profit sharing plan could not hold any stock in the company. (Tr. 101–03.) At the time, the Plan owned 1016 nonvoting, common shares of the company's stock. (Uncontested Facts, para. 9.)

8. Marshall suggested that to achieve Subchapter S status, the company should purchase the Plan's 1016 shares. (Tr. 103.) Marshall further advised the Mortells that in order to properly effectuate the company's purchase of the Plan's shares, the Mortells should: (1) hire an independent appraiser to determine the fair market value of the shares and (2) resign as trustees of the Plan so that the sale of the Plan's shares could be approved by a new, independent trustee, such as a bank. (Tr. 103.)

9. Based on Marshall's advice, in the fall of 1982 James Mortell contacted defendant First Bank of Kankakee, a/k/a First Trust and Savings Bank of Kankakee ("First Trust"), and inquired about the possibility of First Trust succeeding the Mortells as trustees of the Plan. First Trust did not become trustee of the Plan when first contacted by James Mortell in the fall of 1982. However, at that time, First Trust did begin an investigation to determine whether the sale of the Plan's 1016 shares was in the best interest of the Plan and, if so, at what price the Plan should sell the shares. (Uncontested Facts, para. 11.) The investigation was led by Peter J. Porter, the vice president in charge of First Trust's trust department. (Tr. 250–53.) His experience included numerous valuations of closely held corporations. (Tr. 249.)

10. Also in the fall of 1982, James Mortell hired the Special Assets Division of the American National Bank of Chicago ("ANB") to prepare an independent valuation of the Plan's 1016 shares of the Mor-

---

1. The parties have submitted a "Statement of Uncontested Facts" which sets forth those facts on which the parties agree.

2. A Subchapter S corporation is a small business corporation permitted to be taxed as if it were an individual proprietorship. *See* 26 U.S.C. §§ 1361–1379 (1986).

tell Company's stock. (Uncontested Facts, para. 12.)

11. Richard Place, an employee at ANB, was initially assigned to work on ANB's valuation of the Plan's shares. (Tr. 158; Plaintiffs' Exhibit 8 at 12–14.) Place, a CPA who holds a degree in finance and an MBA, had conducted various asset and business valuations while employed at ANB. (Plaintiffs' Exhibit 8, at 8–10.) In connection with his valuation of the Mortell Company stock, Place interviewed the company's management, toured the company's facilities, and analyzed the company's financial data. (Tr. 158–59; Plaintiffs' Exhibit 8, at 12–14.) Place then wrote a letter, dated January 13, 1983, to James Mortell. (Uncontested Facts, para. 14.) Therein, Place stated:

> To effect the purchase of the 1016 shares of Mortell Company, non-voting common stock owned by the firm's profit sharing fund, we were contracted to perform a valuation of the company. Per our analysis of the firm, the basis of which is set forth in the attached preface that will accompany the full valuation report, the value of the Mortell Company—more specifically its stockholders' equity—is estimated to be $30 million as of December 17, 1982 [and] ... the per share value of the non-voting [common] stock is estimated to be $2,970.00.
>
> \* \* \* \* \* \*
>
> As has been discussed previously, a full report delineating the exact steps to be taken to arrive at the values noted above will follow this letter.

(Plaintiffs' Exhibit 1.)

12. Place's letter came into the hands of Marshall. (Tr. 105.) In Marshall's opinion, the valuation figures in Place's letter were much higher than any reasonable valuation should contain. (Tr. 105.) Marshall contacted Place and informed him of his opinion that the valuation figures were too high. (Tr. 105–06.)

13. The next day, Marshall discussed Place's letter with William McFadden, Place's supervisor at ANB. (Tr. 107, 160.) Marshall informed McFadden of his objections to the valuation figures in Place's letter and requested that McFadden re-examine the valuation work which Place had performed. McFadden, who had not approved Place's letter before it was sent out, told Marshall that he would be happy to review Place's valuation work. (Tr. 163.)

14. McFadden did not consider Place's letter to be an official ANB valuation report, and he would not have approved the letter if he had seen it before it was mailed. (Tr. 160–61.) He felt the letter was deficient in that it failed to sufficiently emphasize that a substantial amount of additional work needed to be completed before the ultimate valuation conclusions could be made. (Tr. 160–61.) Further, he was of the opinion that the valuation figures in the letter failed to take into account important valuation considerations such as the Mortell Company's balance sheet and comparable stock transactions. (Tr. 161.)

15. During the conversation between Marshall and McFadden, at no time did Marshall suggest a figure for ANB's final valuation of the Plan's 1016 shares. (Tr. 108, 164, 166–67.) Marshall simply made certain observations regarding various valuation methods and certain aspects of the Mortell Company stock. (Tr. 108, 163–64.)

16. After his discussion with Marshall, McFadden became more directly involved in the valuation of the Mortell Company stock. (Tr. 164–65.) Upon completing his investigation and analysis, McFadden informed Marshall that ANB's final valuation of the equity in the Mortell Company would be no higher than $17 million. (Tr. 166.) Consistent with that figure, ANB produced a final and official valuation report of the Plan's 1016 shares on February 1, 1983. (Uncontested Facts, para. 13.) That valuation report set the value of the Plan's shares at $1235 per share. (Plaintiffs' Exhibit 2, at 1.) The final valuation was determined by employing three separate, generally accepted valuation methods: the discounted cash flow approach, the multiple of earnings ratio approach, and the liquidation approach. The values produced by these three methods were assigned certain weights, and the weighted average of the three values produced

ANB's final valuation figure. (Plaintiffs' Exhibit 2; Tr. 171–75, 184, 211–12, 261.)

17. In a letter dated April 14, 1983, the Mortell Company offered to purchase the 1016 Plan shares for the amount at which they had been appraised by ANB—$1,254,-760 ($1235 per share). (Plaintiffs' Exhibit 24.)

18. On April 15, 1983, Ramon and James Mortell resigned as trustees of the Plan, and First Trust became the trustee. First Trust remained trustee of the Plan until November 18, 1985. (Uncontested Facts, para. 7; Plaintiffs' Exhibits 23, 25, 26.)

19. On April 20, 1983, First Trust accepted the Mortell Company's offer to purchase the Plan's 1016 shares. (Uncontested Facts, para. 15; Plaintiffs' Exhibit 17.)

20. On April 25, 1983, the Mortell Company paid, and First Trust, on behalf of the Plan, received, $1,254,760 ($1235 per share) for the Plan's 1016 shares. (Uncontested Facts, para. 15.)

21. Prior to First Trust's acceptance of the Mortell Company's offer to purchase the Plan's 1016 shares, First Trust, through Porter and others, conducted an investigation and analysis of the proposed transaction. That investigation included a review of the February 1, 1983 valuation report prepared by ANB, an examination of the documents establishing the Plan, and a study of the Plan's asset portfolio. (Tr. 252–55.)

22. In determining to accept the Mortell Company's offer to purchase the Plan's shares at $1235 per share, First Trust considered various factors, including:

a.) that the Mortell Company stock constituted a large portion of the Plan's portfolio, hindering the Plan's diversification;

b.) that the Mortell Company stock had not paid dividends in the past two years, reducing the Plan's investment income;

c.) that the Plan's shares were nonvoting, and thus the Plan had no control over the company in which it was heavily invested;

d.) that there was no ready public market for the stock, since it was not listed on any stock exchange and had been privately held for many years; and

e.) that the offer was consistent with the valuation performed by ANB, a bank which Porter knew as having a fine reputation in the area of business valuations. (Tr. 254–57.)

23. At no time was First Trust ever made aware of Place's January 13, 1983 letter or its contents. (Uncontested Facts, para. 14.)

24. Robert A. Robison, a partner in charge of valuation services for the accounting firm of Coopers & Lybrand, testified as an expert in closely-held business valuations. (Tr. 205–07.) In Robison's professional opinion, the ANB valuation report was a thorough analysis containing all of the necessary elements of a proper valuation. (Tr. 208.) Robison agreed with ANB's employment of three valuation methods; he also approved of the relevant weights assigned to the values produced by each method in computing the final valuation figure. (Tr. 211–12, 221–22.)

25. Robison believed that a reasonably prudent businessman could rely on the ANB valuation report to form an opinion of the value of the Mortell Company's stock. (Tr. 223.) Robison also stated that in his opinion, the ANB valuation report contained a reasonable, and perhaps slightly high, valuation of the Plan's shares. (Tr. 221, 223, 226.)

26. Using a "venture capitalist approach" to valuation, a method not employed by ANB, Robison computed two different values, based on two separate assumptions, for the fair market value of the Plan's shares at around the time they were sold. Assuming that the Mortell Company sold for $28.76 million in cash in 1985, Robison computed the value of the shares to be $1089 per share in January 1983. Assuming the Mortell Company sold for $30 million in cash in June 1986, Robison computed the Plan's shares to be worth $841 per share in January 1983. (Tr. 223–26, First Trust's Exhibit 2.)

27. Robison also testified that Place's January 13, 1983 letter could not be considered a valuation report under generally accepted valuation standards. (Tr. 228.) Robison found the letter deficient in that it did not sufficiently discount the value of the shares for lack of marketability and lack of control. (Tr. 229.) He also stated that a reasonably prudent person would not have relied on the letter's unsupported conclusions concerning the fair market value of the Plan's shares. (Tr. 229.)

28. Edward J. Lucas, a vice president in the Trust Department of LaSalle National Bank in Chicago, also testified as an expert in trust management. In Lucas' opinion, First Trust's decision to accept the Mortell Company's offer to buy the Plan's stock was prudent and in accordance with generally accepted standards of the trust industry. (Tr. 295, 298.) In forming that opinion, Lucas noted that the stock was nonvoting, nonincome-producing, and not readily marketable. He also believed that the stock constituted too large of a percentage of the Plan's assets. (Tr. 296.) Therefore, his opinion was that it was not in the best interests of the Plan participants and beneficiaries for the Plan to have retained the stock. (Tr. 305.)

29. In a letter dated May 31, 1983, the Mortell Company notified the Plan participants that First Trust had been appointed trustee of the Plan and that the Mortell Company stock owned by the plan had been sold. The letter stated that the stock "was sold back to the [Mortell] Company at a profit to the Plan of more than $300,000 on an initial investment of $900,000." (Uncontested Facts, para. 19; Plaintiffs' Exhibit 3.). Along with the May 31, 1983 letter, the Mortell Company sent to each Plan participant a Summary Plan Description which outlined the terms and conditions of the Plan. (Uncontested Facts, para. 18; Mortells' Exhibit 1.)

30. During the period from 1976 until May 1983, Summary Plan Descriptions had not been sent to the Plan participants. (Uncontested Facts, para. 18.) At no time did plaintiffs make a request upon the Plan's trustees or administrators to review or inspect any documents relating to the Plan. (Uncontested Facts, para. 20.)

31. On April 7, 1985, First Trust filed the 1983 Annual Report of the Plan ("5500 form") with the Department of Labor. (First Trust's Exhibit 3.) The financial statement report included as part of the 5500 form contained the following entry:

Mortell Company—purchase of its stock held by the plan.

| Description | Cost | Selling Price | Current Value | Gain or (Loss) |
|---|---|---|---|---|
| 1,016 shares | $795,840 | $1,254,760 | $1,254,760 | $458,920 |

Note—Current value was determined by an appraisal of the company stock by American National Bank and Trust Company of Chicago–Special Asset Division on February 1, 1983. The trustees of the plan, First Trust & Savings Bank of Kankakee, authorized the sale of the stock to Mortell Company for the value of $1,235 per share as determined by the appraisal.

(First Trust Exhibit 3, attachment, at 8.) The 5500 form was a public document open for public review. (First Trust Exhibit 3, at 1.)

32. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

### I. *Jurisdiction*

1. The court has jurisdiction over this action pursuant to section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). Venue in this district is proper pursuant to 28 U.S.C. § 1391(b). The plaintiffs have authority to bring this action under sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## II. *Count I*

### A. *First Trust*

2. As trustee of the Plan from April 20, 1983 to November 18, 1985, First Trust was a Plan fiduciary. 29 U.S.C. § 1002(21)(A). As such, First Trust owed plaintiffs, each of whom were Plan participants, the fiduciary duties outlined in sections 403 and 404 of ERISA, 29 U.S.C. §§ 1103, 1104.

3. Under section 403 of ERISA,

... the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29 U.S.C. § 1103.

4. Under section 404 of ERISA,

a [plan] fiduciary [must] discharge his duties with respect to a plan solely in the interest of the [plan's] participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29 U.S.C. § 1104.

5. Pursuant to section 409(a) of ERISA, 29 U.S.C. § 1109(a), First Trust is liable for any breach of the fiduciary duties imposed on them by sections 403 and 404.

6. In Count I of their consolidated complaint, plaintiffs allege that First Trust breached its fiduciary duties to the Plan in violation of sections 403 and 404. Specifically, plaintiffs allege that First Trust failed to act prudently, diligently, and solely in the interests of the Plan by: (1) failing to conduct an independent investigation of whether to sell the Plan's stock; (2) failing to independently determine the appropriate price for the Plan's stock; (3) failing to sell the stock at an adequate price; and (4) failing to negotiate for an "equity kicker" provision under which the Plan would receive additional money in the event that the Mortell Company was later sold for a higher price per share than the Plan had been paid.

7. First Trust argues that plaintiffs' claims are barred by the statute of limitations. In support of that argument, First Trust relies on section 413 of ERISA, 29 U.S.C. § 1113. Prior to its amendment in 1987,[3] section 413 provided:

(a) No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation ... after the earlier of ... (2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title.

8. First Trust claims that under section 413(a)(2)(B), the statute of limitations began to run on plaintiffs' claims when the Plan filed its 1983 Annual Report ("5500 form") with the Department of Labor on April 8, 1985. Therefore, First Trust maintains that the limitations period ran out no later than April 8, 1988, more than six months before the filing of plaintiffs' claims.

9. First Trust relies on *Brock v. TIC International Corp.*, 785 F.2d 168 (7th Cir. 1986), to support its position. In *Brock,* the court declared that "[t]he 'could reasonably be expected' test [under § 413] ... for starting the three-year [limitations] period running is intended to pick up the case where a probable violation is evident to anyone who reads the [plan] report with

---

3. The amendment, which deleted subpart (B) of section 413(a)(2), was enacted December 22, 1987, and applied only to reports filed after December 31, 1987. *See* Pub.L. No. 100–203,

§ 9342(d), 101 Stat. 1330–371 (1987). Since the events at issue in this case occurred prior to December 1987, the amendment is inapplicable here.

reasonable care." *Id.* at 171. The report at issue in *Brock* contained some glaring evidence of misconduct by the plan's fiduciaries. Specifically, the report showed that the fiduciaries had agreed, without receiving any consideration, to hold the plan's former insurer harmless on outstanding insurance claims for which the insurer otherwise would have been liable. *Id.* at 170–71. The plaintiff in *Brock,* who based his § 404 claim against one of the plan's fiduciaries on the hold harmless agreement, failed to file his ERISA action until three and one-half years after the report was filed. *Id.* at 169–70. Therefore, the *Brock* court held that plaintiff's claims were time-barred under the three-year limitations period in § 413(a)(2)(B).

10. The court finds that the instant case is distinguishable from *Brock.* Here, the 5500 form filed by the Plan did not contain sufficient information from which a probable breach of fiduciary duty was evident. Although the 5500 form contained a description of the Plan's stock transaction—including the sales price, cost basis, and net profit—the report did not provide any indication that something was awry in connection with the transaction. There were no red flags which would lead a reasonable person to believe that further inquiry into the circumstances surrounding the transaction were necessary. Unlike in *Brock,* the 5500 form did not clearly show, or even remotely suggest, that First Trust had received inadequate consideration in exchange for Plan assets or breached its fiduciary duties in any way. Under these circumstances, the court cannot find that the 5500 form put plaintiffs on notice of First Trust's alleged breach of fiduciary duty. To hold otherwise would be to require plaintiffs to exhaustively investigate all of the innumerable facts contained in the report. Such a burden would be wholly unreasonable. Therefore, the court rejects the argument that plaintiffs' breach of fiduciary duty claims against First Trust are time-barred.

11. However, the court finds that First Trust did not breach its fiduciary duties to the Plan. First, the evidence shows that First Trust acted independently in deciding to sell the Plan's stock. Porter testified that in deciding to sell the Plan's stock, First Trust relied on Porter's review of the Plan documents, the Plan's portfolio of assets, and the ANB valuation report. (Tr. 252–55.) Porter further testified that First Trust's decision to sell was based on various strategic factors, including certain unfavorable characteristics of the stock and the lack of diversification of the Plan's assets. (Tr. 254–57.) This testimony was virtually unimpeached and unrebutted.

12. Although plaintiffs argue that First Trust was concerned with the interests of the Mortells, not the Plan, and that First Trust merely "rubber-stamped" a transaction which had been prearranged by the Mortells for their own benefit, plaintiffs' argument amounts to nothing more than unsupported innuendo. Nothing in the record shows that there was any secret agreement or understanding between First Trust and the Mortells. In fact, there was simply no evidence establishing that First Trust was coerced or influenced by considerations other than the best interest of the Plan in deciding to sell the Plan's stock.

13. Plaintiffs also failed to establish that First Trust acted imprudently in accepting the Mortell Company's offer to purchase the stock for the amount at which it was appraised by ANB.

14. Porter, Robison, and Lucas testified that ANB's valuation report was in accordance with generally accepted valuation principles. (Tr. 208–12, 261, 298–300.) Marshall, Robison, Lucas and Porter all agreed that $1235 per share was a reasonable, if not high, valuation of the Plan's stock. (Tr. 109, 223, 263, 299–300.) The only testimony contradicting the ANB valuation—the testimony of Place—was not offered against First Trust. (Tr. 24–26.) Moreover, plaintiffs concede that at no time were the contents of Place's January 13, 1983 letter ever known to First Trust. (Uncontested Facts, para. 14.) Therefore, the evidence shows that First Trust's decision to rely on the ANB report in determining fair market value of the stock was sound and reasonable.

15. Plaintiffs claim that First Trust failed to take numerous specific actions which were required in order for First Trust to satisfy its fiduciary duties to the Plan. In particular, plaintiffs contend that First Trust should have demanded a higher price per share for the stock, negotiated for an "equity kicker," and pursued other buyers. These actions were required, according to plaintiffs, in order for First Trust to fulfill its duty to achieve the "highest possible price." (Plaintiffs' Argument, at 29.)

16. The duty required of a fiduciary, however, is merely that he conduct a prudent, independent investigation of a particular investment, not that he achieve the highest possible price. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir. 1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). As discussed above, the record lacks sufficient evidence showing that First Trust breached that duty. Moreover, plaintiffs failed to offer any evidence showing that other buyers were interested in purchasing the Plan's stock or that the Mortell Company was willing to pay more than the fair market value of the stock as determined by the ANB valuation. Therefore, nothing in the record establishes that the specific actions plaintiffs claim First Trust should have taken were feasible. Accordingly, the court finds in favor of First Trust on Count I.

### B. *James and Ramon Mortell*

17. Plaintiffs also allege in Count I that James and Ramon Mortell breached their fiduciary duties to the Plan in violation of sections 403 and 404 of ERISA. These breach of fiduciary duty allegations can be divided into three categories.

18. First, plaintiffs argue that the Mortells breached their fiduciary duties by selling the Plan's stock for inadequate consideration. This argument is misplaced. When the Plan's stock was sold on April 20, 1983, the Mortells were no longer trustees of the Plan. They had resigned and First Trust had taken over as trustee on April 15, 1983. Having resigned as trustees, the Mortells no longer were fiduciaries

to the Plan. Therefore, they cannot be liable for the sale of the Plan's stock under sections 403 and 404 of ERISA.

19. Plaintiffs contend that the Mortells should be liable for the sale because they were still fiduciaries of the Plan even after their resignation as trustees. To support this contention, plaintiffs rely on ERISA's relatively broad definition of "fiduciary," which reads, in part:

... a person is a fiduciary with respect to a plan to the extent (i) he exercises discretionary authority or discretionary control respecting management of such plan ... or disposition of its assets ... or (iii) he has discretionary authority or responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

20. As this court has already discussed, however, plaintiffs failed to produce any hard evidence showing that the Mortells exercised discretionary authority or control over the Plan after their resignation as trustees. The evidence shows that First Trust fulfilled its fiduciary duties independently after being appointed trustee. Plaintiffs' assertions that First Trust was influenced or coerced by the Mortells are simply unsupported by the record. Therefore, the Mortells cannot be liable as fiduciaries under sections 403 and 404 of ERISA for the sale of the Plan's stock.

21. Plaintiffs' second set of breach of fiduciary duty claims against the Mortells relates to the Mortells' conduct during the period immediately prior to the sale. Plaintiffs maintain that just prior to the sale, the Mortells breached their fiduciary duties in two ways: (1) by negotiating with ANB, through Marshall, for a reduction in ANB's valuation of the stock after receiving Place's January 13, 1983 letter; and (2) by failing to notify either First Trust or the Plan's participants of Place's January 13, 1983 letter.

22. With respect to Marshall's contact with ANB, the evidence showed that Marshall merely expressed concern to McFadden regarding Place's letter and then asked McFadden to look into Place's work. (Tr.

107–08, 161–63.) McFadden testified that Marshall never suggested or requested that ANB produce a certain valuation figure. (Tr. 164.) McFadden also attested that Marshall never attempted to intimidate him in any way. (Tr. 164.) Plaintiffs failed to offer any evidence to rebut Marshall's and McFadden's testimony. Therefore, plaintiffs failed to demonstrate that Marshall asserted improper influence over ANB's valuation of the Plan's stock. Accordingly, Marshall's contact with ANB did not constitute a breach of the Mortells' fiduciary duties.

23. Regarding Place's January 13, 1983 letter, the record is clear that the Mortells never disclosed the letter to First Trust. Place's letter related to the purchase of the Plan's shares, and its contents were arguably favorable to the Plan. Therefore, the Mortells probably would have served the best interest of the Plan by making sure that First Trust was aware of the letter.

24. Nevertheless, the court finds that the Mortells' failure to notify First Trust of the letter did not constitute a breach of fiduciary duty. After consulting with McFadden, who was Place's supervisor, Marshall learned that Place's letter in no way constituted a final valuation of the Plan's shares; more work was required prior to the issuance of ANB's final valuation. (Tr. 107–08; 163–64.) McFadden also agreed that Place had failed to take various important factors into consideration. Moreover, Place's letter had not been approved by McFadden, as was customary ANB procedure. (Tr. 160–61.) Therefore, Place's letter could reasonably have been dismissed by Marshall as representing Place's tentative, unofficial, unauthorized opinion. As such, it was not crucial for the Mortells to disclose Place's letter to First Trust.

25. Moreover, the court is not convinced that the Mortells' disclosure of Place's letter to First Trust would have had any affect on First Trust's decision to sell the Plan's shares. Armed with the knowledge of Place's opinion, First Trust would have probably contacted ANB. McFadden then would have told First Trust exactly what he told Marshall—that Place's letter was unofficial and unauthorized, and that the official ANB valuation report would follow after further investigation and analysis. Under those circumstances, it is unlikely that Place's letter would have affected First Trust's determination of whether to sell the Plan's shares. Therefore, the Mortells' failure to disclose Place's letter to First Trust had no material adverse consequences to plaintiffs.

26. Plaintiffs' final set of breach of fiduciary duty claims against the Mortells relates to the time period prior to the Mortells' decision to actively pursue the sale of the Plan's stock in the Mortell Company. Plaintiffs allege that during that time, the Mortells breached their fiduciary duties by: (1) acquiring the stock for an inflated price and for improper purpose; (2) refusing to pay dividends on the stock once it was acquired by the Plan; and (3) allowing the stock held by the Plan to be transformed from voting shares to nonvoting shares.

27. Plaintiffs have failed to produce sufficient evidence to substantiate any of these claims. Regarding the payment of dividends, plaintiffs' sole support consists of evidence showing that dividends were paid on the Mortell Company stock in the four years prior to the Plan's acquisition of the stock (1977–1980), but not during the two years that the Plan held stock (1981–1982). By itself, this evidence means little, if anything. Numerous facts and circumstances contribute to a company's decision to pay dividends on its stock. Market conditions, firm strategies, and firm prosperity all affect the company's ability and desire to pay dividends. Plaintiffs' argument addresses none of these concerns. Instead, plaintiffs rely on the bare fact that dividends were not paid in attempt to show that the Mortells breached their fiduciary duties. Such a paltry showing is clearly insufficient to show improper motive or purpose on the part of the Mortells. Therefore, the court rejects plaintiffs' claim regarding dividends.

28. Similarly, plaintiffs also failed to introduce sufficient evidence to support their

claim that the Mortells breached their fiduciary duties by allowing the Plan's stock to be converted from voting to nonvoting shares. Plaintiffs allege that the Plan initially acquired 2400 shares of the Mortell Company stock—810 voting shares and 1590 nonvoting shares—but these shares were later subjected to a reverse stock split whereby the Plan received one share of new, nonvoting stock for every 2.36 shares of old stock, or a total of 1016 new, nonvoting shares. Plaintiffs, however, failed to offer proof of any of the circumstances surrounding the reverse stock split. They rest their claim solely on the assertion that the Mortells, as trustees, should have made sure that the Plan retained its voting rights on the shares. This bald assertion does not prove plaintiffs' claim. Absent additional facts, this court is unable to conclude that plaintiffs have proven, by a preponderance of the evidence, that the Mortells failed to act in the best interests of the Plan in connection with the stock split.

29. Plaintiffs' final breach of fiduciary duty claim against the Mortells concerns the Mortells' decision to acquire stock in the Mortell Company on behalf of the Plan. Plaintiffs maintain that the Plan's acquisition of the stock breached the Mortells' fiduciary duties because: (1) the Mortells' motive in acquiring the stock for the Plan was not to benefit the Plan, but to assure that the Mortells maintained control of the company,[4] and (2) the Mortells caused the Plan to pay more for the stock than it should have.

30. To support the latter of these claims, the only "evidence" which plaintiffs offer consists of inferences and conclusions drawn from various exhibits. These conclusions are so jumbled and inaccurate that they do not merit individual response. Therefore, at the risk of sounding redundant, the court simply finds that there is no evidence in the record to support plaintiffs' claims that the Plan paid too much for its stock in the Mortell Company.

31. However, plaintiffs do have some support for their claim that the Mortells did not act solely for the benefit of and in the interests of the Plan when they acquired the Mortell Company stock. Specifically, James Mortell's testimony, although unclear, suggests that the Plan acquired the stock from Donald Mortell so as to allow the Mortell Company to remain a family-owned business. (Plaintiffs' Exhibit 29, at 5–7.) This testimony indicates that the Mortells may have invested Plan assets based on considerations other than the best interest of the Plan.

32. Nevertheless, even if the Mortells' decision to acquire the Mortell Company stock on behalf of the Plan constituted a breach of their fiduciary duties, plaintiffs have failed to prove any damages resulting from that breach. Plaintiffs have submitted evidence showing that the cost of the stock to the Plan was $891,420.12 in November of 1981.[5] (Plaintiffs' Exhibit 16.) It is undisputed that the shares sold for $1,254,760 in April of 1983. Thus, the Plan made a profit of about $363,000 over approximately one and one-half years—a return on their initial investment of over 40 percent. While it is possible—but not likely—that the Plan may have been able to achieve even a higher rate of return on its money over such a short time span, plain-

---

4. Plaintiffs allege that the Plan bought its stock in the Mortell Company from Donald Mortell, the deceased brother of defendants James and Ramon Mortell. At the time, Donald Mortell's shares were subject to a bank lien because they had been used by Donald Mortell as collateral to obtain a loan from the bank. Plaintiffs claim that James and Ramon caused the Plan to purchase Donald's shares in the company so as to prevent the bank from acquiring the shares upon Donald Mortell's default on the loan.

5. The actual cost of the stock to the Plan is unclear. In Plaintiffs' Exhibit 16, which purports to be a written agreement for the sale of 2400 shares of Mortell Company stock between purchasers James and Ramon Mortell (as Plan trustees) and seller Donald Mortell, the sales price is listed as $891,420.12. Plaintiffs' Exhibit 3, a May 31, 1983 letter from Mortell Company to Plan participants, appears somewhat consistent with Plaintiffs' Exhibit 16. The letter states that the Plan's initial investment in the Mortell Company stock was $900,000. However, the Plan's 1981 and 1982 financial statements list the cost of the stock as $824,059 (Plaintiffs' Exhibits 14, at 10, and 15, at 6.), and the Plan's 1983 financial statement lists the cost as $795,840. (First Trust's Exhibit 3, at 8.)

tiffs have not provided any evidence of lost investment opportunities. Therefore, any damages plaintiffs claim they suffered from the Plan's investment in Mortell Company stock amounts to pure speculation. As a result, this court cannot rule in plaintiffs' favor on Count I.

### III.  *Count II*

33. In Count II of the complaint, plaintiffs allege that James and Ramon Mortell violated section 405 of ERISA, 29 U.S.C. § 1105. That section provides that a fiduciary is liable in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if ... he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a)(1)–(3).

34. Pursuant to the plain language of section 405, an individual is not liable under that section unless it is first determined that the individual's co-fiduciary has committed a breach of fiduciary duty.

35. As this court has previously discussed, plaintiffs in the instant case have failed to establish that either James or Ramon Mortell breached his fiduciary duties to the Plan. Therefore, neither can be liable under section 405 based on the other's actions.

36. In addition, neither James nor Ramon Mortell can be liable under section 405 for the actions of First Trust. In the first place, First Trust and the Mortells were not co-fiduciaries. First Trust succeeded the Mortells as trustee. Secondly, this court has already determined that First Trust did not breach its fiduciary duties to the Plan. As a result, the Mortells cannot be liable under section 405 of ERISA. The court therefore finds in favor of Ramon and James Mortell on Count II.

### IV.  *Count III*

37. In Count III of the complaint, plaintiffs allege that James and Ramon Mortell breached their fiduciary duties by failing to satisfy certain reporting and disclosure requirements set forth in sections 104 and 105 of ERISA, 29 U.S.C. §§ 1024, 1025.

38. Sections 104 and 105, however, impose duties only on plan administrators, not plan trustees. *Lieske v. Morlock*, 570 F.Supp. 1426, 1430 (N.D.Ill.1983); *Turner v. CF & I Steel Corp.*, 510 F.Supp. 537, 544–45 (E.D.Pa.1981).

39. It is undisputed in this case that until his death in September 1982, defendant George Blais was administrator of the Plan. (Uncontested Facts, para. 6.) With respect to the period subsequent to September 1982, plaintiffs offered no evidence establishing that James and Ramon Mortell functioned as Plan administrators. Therefore, sections 104 and 105 are inapplicable to the Mortells.

40. Moreover, even if the Mortells were Plan administrators, plaintiffs would not be entitled to the damages they seek for the alleged violations of sections 104 and 105. Section 502(c), 29 U.S.C. § 1132(c), the only provision in ERISA which allows plan participants to recover money (up to $100 per day) for violations of ERISA's reporting and disclosure requirements, applies only where plan administrators have refused to comply with a request for information. *See Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 621–22 (7th Cir.1987). In the instant case, it is undisputed that plaintiffs did not make any written request upon the Plan administrator for the documents they now claim they had a right to review. (Uncontested Facts, para. 20.) Therefore, plaintiffs cannot recover under sections 104 and 105 of ERISA. Accordingly, the court finds in favor of Ramon and James Mortell on Count III.

### V.  *Count IV*

41. Count IV of the complaint is brought only by plaintiff Jesse Largen. Largen claims that defendant George Blais, the Plan administrator, is liable under ERISA for imprudently investing Plan assets. Largen further maintains that James and Ramon Mortell, as trustees of the

Plan, are liable for Blais' allegedly prudent investments.

42. Unsurprisingly, however, Count IV suffers from the same deficiency as the rest of plaintiffs' claims: there is insufficient evidence in the record to support the allegations contained therein. The only evidence Largen offers to show that defendants invested imprudently is that the Plan suffered a substantial loss in fiscal 1981 and that the Plan lost a total of over $200,000 from its investments in three stocks which Largen maintains were "speculative." This evidence of losses sustained by the Plan is insufficient to establish that the Plan's assets were imprudently invested. Many investments are attractive and prudent when made, yet they wind up resulting in large losses. Of course, hindsight makes any losing investment look like a poor decision. However, the particular facts and circumstances relevant to the time when the investment was made determines its prudence. Largen offers no evidence of the facts and circumstances surrounding the Plan's investments. Therefore, he has failed to prove his claim that Blais or the Mortells acted imprudently in connection with the Plan's investments.

43. Largen points out that on March 7, 1987, this court entered a technical default judgment against the estate of George Blais for failure to appear or answer Largen's complaint. However, in the order of default, Largen was ordered to present a prove-up of his damages at trial. This court finds that Largen has failed to show that he suffered damages resulting from any improper act on the part of Blais. As the court has already discussed, although Largen offered evidence of losses suffered by the Plan, he failed to offer any competent evidence establishing that the losses were attributable to any imprudent investing by Blais. Therefore, despite the default judgment against Blais, the court finds that Largen is entitled to no damages on Count IV.

44. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

## CONCLUSION

45. For the foregoing reasons, the court finds in favor of First Trust, James Mortell, and Ramon Mortell.

46. The court further finds that plaintiffs are entitled to no damages on their technical default judgment against the estate of George Blais.

IT IS SO ORDERED.